## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

―――――――――――――――――――――

ISRAEL ALVARADO, *et al.*,

           Plaintiffs,

           v.

LLOYD AUSTIN, III, in his official
capacity as Secretary of Defense, *et al.*,

           Defendants.

―――――――――――――――――――――

Civil Action No. 8:22-cv-01149-WFJ-CPT

## DEFENDANTS' OPPOSITION

In warfare, disease has historically accounted for more service member deaths than battlefield injuries, and a healthy force has been a key part of America's military readiness. Prior to the COVID-19 pandemic, the Department of Defense's ("DoD") decades-old immunization program required that all service members obtain at least nine immunizations, and an additional eight depending on circumstances. In the midst of a deadly pandemic that has killed over one million Americans, and seeking to protect force readiness by reducing the risk of infections, hospitalizations, and deaths among service members, DoD added vaccination against COVID-19 to this long list of immunizations already required for service members.

Plaintiffs are 31 service members currently serving as chaplains across the Armed Forces. They disagree with senior military leaders' judgment that vaccination for COVID-19 is necessary for military readiness, claim that the vaccination order violates their religious freedom and amounts to a religious ritual, argue that the COVID-19 vaccine is not a vaccine, and seek emergency relief that will shield them from any consequences of their failure to follow a lawful order. Multiple jurisdictional obstacles

1

preclude a finding that Plaintiffs are likely to succeed on their claims. Venue is not proper, and Plaintiffs' claims against the military are not ripe or justiciable prior to exhaustion of military remedies, especially because most Plaintiffs have not shown that their exemption requests have been fully adjudicated.

The merits of their claims fare no better. The National Defense Authorization Act of 2013 (as amended) does not create a private right of action, and it does not exempt chaplains from mandatory vaccination requirements, which are not a religious "ritual." The vaccination requirement satisfies RFRA (and the Free Exercise clause) because the military has an extraordinarily compelling interest in military readiness and the health and readiness of its forces and no less restrictive measure serves those interests equally well as vaccination. The religious accommodation processes provided across the Services are meaningful processes that result in individualized consideration of each request and, in appropriate cases, accommodation. There is well-established deference afforded to the military's professional judgments concerning the importance of particular military interests and an assessment of acceptable military risk.

Plaintiffs cannot establish irreparable harm, and the balance of harms tips sharply in favor of the military. They are not being forced to violate religious beliefs and none of the other alleged harms are irreparable. By contrast, an injunction against the vaccination requirement—even if applied only to Plaintiffs—would degrade military readiness and harm national security.

## BACKGROUND

**The COVID-19 Pandemic.**  COVID-19 is a respiratory disease that can result in severe symptoms and death, and, to date, has infected more than 88 million Americans and killed over one million. *See* CDC, *COVID Data Tracker*,

https://perma.cc/S6MP-SX46?view-mode=server-side&type=image. Ninety-six service members have died from COVID-19, and over 400,000 have contracted the disease. Ex. 1, Stanley Decl. ¶ 3. Of those 96 service members, only two were fully vaccinated. *Id.* Many otherwise healthy service members became seriously ill or developed long-haul COVID-19, potentially affecting their long-term ability to perform their missions. Ex. 2, Rans Decl. ¶¶ 9–10.

**Department of Defense Vaccination Directives.** Vaccines have played a longstanding and important role in America's military readiness. Under DoD's immunization program, nine vaccines (including the annual flu vaccine) are required for all service members, and eight others are required when certain elevated risk factors are present. Air Force Instruction ("AFI") 48-110_IP, Table D-1, https://perma.cc/82YE-EA3U; *see also* DoD Instruction ("DoDI") 6205.02, https://perma.cc/8HLA-AXQB. It is part of DoD's overarching requirement, called Individual Medical Readiness, that each service member be medically ready for service and mobilization. DoDI 6025.19, https://perma.cc/TR75-JRVD.

On August 9, 2021, the Secretary of Defense, noting the impact of COVID-19 on military readiness and concluding that vaccination "will ensure we remain the most lethal and ready force in the world," announced that he would add the COVID-19 vaccine to the list of vaccines required for all service members by the earlier of mid-September 2021 or upon approval by the Food and Drug Administration ("FDA"). *See* Sec'y of Def. Mem., https://perma.cc/S4R3-2VZW. On August 24, 2021, one day after FDA announced the approval of the Pfizer vaccine, the Secretary directed the Secretaries of the Military Departments to immediately ensure that all members of the armed forces under DoD authority were fully vaccinated against COVID-19. *See* Sec'y of Def. Mem., https://perma.cc/N759-S758.

3

**Services' Implementation of the COVID-19 Vaccination Directive and Religious Exemptions.** Shortly after the Secretary of Defense issued his vaccine directive, each of the Services issued initial implementing guidance, setting deadlines for full vaccination. *See* Sec'y of Air Force Mem., https://perma.cc/6E2W-3EQM; Ex. 3, Mahoney Decl. ¶¶ 7-8; Ex. 4, Merz Decl. ¶ 3 (Navy); Ex. 6, Furness Decl. ¶¶ 3-5 (Marine Corps); Ex. 8, Jones Decl. ¶ 4 (Coast Guard).

As with other vaccine requirements, Service implementation guidance establishes medical, administrative and religious exemptions. *See* Ex. 3 (Fragmentary Order ("FRAGO") 5 to Army Execute Order 225-21) ¶ 3.D.8.B.6; Ex. 5 (NAVADMIN 190/21) ¶ 3.d; Ex. 7 (MARADMIN 462/21) ¶¶ 3j, 3k; Ex. 10, AF Implementation Guidance, ¶¶ 4.5, 5.1; Ex. 8 (ALCOAST 352-21) ¶ 7. Members may receive a medical exemption if they currently have COVID-19, are pregnant, or have another medical contraindication for the vaccine. *See* Ex. 3 ¶¶ 11-14 (Army); Ex. 4 ¶¶ 5-10 (Navy); Ex. 6 ¶ 7 (Marines); Ex. 11, Chapa Decl. ¶ 6 (AF); Ex. 8 ¶ 5 (CG).[1] Services typically have other discrete administrative exemptions, *e.g.*, for members who are missing or who are on terminal leave in anticipation of separation. *See, e.g.*, Ex. 4 ¶ 11 (Navy); Ex. 6 ¶ 10-11 (Marines); Ex. 14, Long Decl. ¶¶ 3-6 (AF); Ex. 13, Little Decl. ¶¶ 3–4 (AF).

Each Service has a process available to members making religious accommodation requests (RARs), including an appeal process from an unfavorable initial decision. Ex. 3 ¶¶ 15-21 (Army); Ex. 4 ¶ 12 (Navy); Ex. 6 ¶ 14-28 (Marines); Ex. 12, Streett Decl. ¶¶ 4-16 (AF); Ex. 8 ¶ 6-12 (CG). Although the procedures and the ultimate decisionmaker in each instance varies, each Service's process involves the input of at least

---

[1] *See, e.g.* DAF COVID-19 Statistics – June 28, 2022, https://perma.cc/3QFU-QRMZ (469 approved medical exemptions among active-duty and reserve members in AF); Ex. 11 ¶ 20 (providing statistics as of July 4, 2022); Navy COVID-19 Update – June 22, 2022, https://perma.cc/QP6W-M9QE (273 medical exemptions among active-duty and reserve members in Navy).

one chaplain, medical professionals, the requesting service member, and the commanding officer. *See* Ex. 3 ¶¶ 15-21; Ex. 4 ¶ 12; Ex. 12 Streett, ¶¶ 4-16; Ex. 8 ¶ 6-12 (CG). In each process, a senior military leader individually reviews each request and appeal in light of all available information. *See, e.g.,* Ex. 3 ¶ 20; Ex. 4 ¶ 12; Ex. 15, Bannister Decl. ¶¶ 3, 7 (AF); Ex. 8 ¶ 12 (CG). The Services have approved some RARs where appropriate. *See, e.g.*, Army Updates Total Army COVID-19 Vaccination Statistics – July 8, 2022, https://perma.cc/9SF5-PYC9; Navy COVID-19 Update – June 22, 2022; USMC Monthly COVID Update – July 6, 2022, https://perma.cc/2S5D-V5NS; DAF COVID-19 Statistics – June 28, 2022.

**Refusal to Vaccinate**. In general, active-duty service members who refuse to comply with an order to vaccinate against COVID-19, absent an approved exemption, will face initiation of administrative discharge proceedings. *See* Ex. 3 ¶¶ 23-33; Ex. 4 ¶¶ 13–16; Ex. 6, ¶ 29-38; Ex. 16, Hernandez Decl. ¶¶ 4-17 (AF). For the Navy, these proceedings are largely enjoined with respect to a class of Navy service members who have submitted RARs. *See* Ex. 4 ¶¶ 19-23. For the other Services, the procedures available in such proceedings vary by Department, time in service, and other factors, but overall enable the member to consult with free defense counsel and present arguments against separation. *See* Ex. 3 ¶¶ 23-33; Ex. 6 ¶ 30; Ex. 16 ¶ 4-17. The administrative process generally takes at least several months and, at numerous levels of review, may result in the decision to retain the member. *See* Ex. 3 ¶¶ 23-33; Ex. 6 ¶ 31-38; Ex. 16 ¶ 4-17. In general, a service member discharged for refusing to receive the COVID-19 vaccine will receive either an Honorable Discharge or General (Under Honorable Conditions) Discharge. Pub. L. No. 117-81 § 736(a), 135 Stat. 1541, 1800 (2021).

Even if a service member is ultimately discharged at the end of the process, further military remedies remain available to request correction to his military record

through a Discharge Review Board and/or Board for Correction of Military Records. *See* Ex. 3 ¶¶ 23-33; Ex. 4 ¶ 24; Ex. 6 ¶ 39-41; Ex. 16 ¶¶ 16-17.

With respect to Reservists and the National Guard, the process following refusal of an order to vaccinate may differ. To date, the Army has not issued guidance on this process for members of the National Guard and Reserve Component. Ex. 3 ¶ 35. However, there will be no DoD funding for pay for Army National Guard and Reserve Soldiers who do not comply with the vaccination requirement by July 1, 2022, unless they have a pending or approved exemption request. *Id*. Further, those Army National Guard and Reserve Soldiers will not be allowed to participate in drills, training, or other federal duties conducted in a Title 10 or Title 32 U.S. Code status. *Id*. But these policies do not apply to members of the National Guard serving in a purely State Active Duty status performing State military service. *Id*.

For the Air Force, Reserve members who refuse to comply with the COVID-19 vaccination mandate, absent an exemption, will be placed in a no pay/no points status and involuntarily reassigned to the Individual Ready Reserve (IRR), which takes a few months. Ex. 17, Heyen Decl. ¶¶ 8-15. Reassignment to the IRR is not a discharge or separation; it allows the Air Force Reserve to transfer a member with remaining military service obligation to the IRR, where they may complete their service obligation, rather than discharging the member out of the Air Force. *Id*. Members reassigned to the IRR are eligible to return to a participating status should they meet readiness standards in the future. *Id*.

**This Action**. Plaintiffs are 31 service members who purport to bring a class action on behalf of military chaplains and assert statutory and constitutional claims related to the vaccine order against DoD and several military Services, as well as

statutory claims against HHS, FDA, and CDC related to the supposed "re-definition" of vaccine. Of the named Plaintiffs:

- Twelve Army Plaintiffs, 4 Air Force Plaintiffs, and 1 Army National Guard Plaintiff have a RAR or appeal pending. *See* Compl. ¶¶ 32, 37, 39, 43-44, 46-47, 49, 52-54, 58 (Calger, Harris, Hirko, Lee, Lewis, Pak, Pogue, Schnetz, Snyder, Troyer, Weaver, Young); ¶ 56 (Withers); ¶¶ 40, 45, 48, 55 (Ingram, Nelson, Rodriguez, Wine); *see also* Ex. 15, Bannister Decl. ¶ 8. They are therefore not currently subject to the vaccination requirement or disciplinary action. *See* Ex. 3 ¶¶ 18, 35; Ex. 12 ¶ 15.

- Six Air Force Plaintiffs have had an RAR appeal denied. *See* Ex. 21, Wolfram Decl. ¶¶ 11-18, 28-30 (Layfield, Barfield, Fussell); Ex. 29, Diehl Decl. ¶¶ 3-17 (Jackson); Ex. 25, Pennington Decl. ¶¶ 4-18 (Brobst); Ex. 27, Shultz Decl. ¶¶ 3-9 (Henderson); *see also* Exs. 22-24, 26, 28, 30 (RAR files). Plaintiff Layfield (Reservist) requested separation, and the command is not taking any adverse action while the request is pending. Ex. 21 ¶¶ 28-30. Plaintiff Barfield (Reservist) currently has a temporary medical exemption, and no adverse action has been taken. Ex. 21 ¶¶ 11-14. Plaintiff Jackson is attempting to retire and has been given an extension so that it can be determined whether retirement is workable. Ex. 29, ¶¶ 3-17. Plaintiff Brobst (Reservist) received a Letter of Reprimand and declined to respond. Ex. 25 ¶¶ 4-18. Plaintiff Henderson had a medical exemption that expired July 7, but no adverse action has yet been initiated. Ex. 27 ¶¶ 3-9. Similarly, no adverse action has yet been taken against Plaintiff Fussell. Ex. 21 ¶¶ 15-18.

- Of the 4 Navy Plaintiffs serving in the Navy, 3 still have a pending RAR or appeal, *see* Compl. ¶¶ 33-34, 58 (Cox, Eastman, Wronski), and one has been denied, ¶ 28 (Alvarado), see also Ex. 34 (RAR file), but all are covered by the Navy injunction in *Navy Seals 1-26*, 2022 WL 1025144, at *9 (N.D. Tex. Mar. 28, 2022) (currently on appeal). Although that injunction is partially stayed by the Supreme Court, it continues to enjoin the Navy from disciplining or separating class members. *See* Ex. 4 ¶¶ 19-23; Ex. 9, Jones Decl. Ex. 21 ¶¶ 3-9 (Cox).

- Two Navy Plaintiffs assigned to other services have had their RAR appeals denied, and 2 are still pending. The Coast Guard and Marine Corps denied the RAR appeals of Plaintiffs Brown and Gentilhomme, but no administrative action has been initiated. Compl. ¶¶ 31, 36; Exs. 31-32 (Brown); Ex. 33 (Gentilhomme). Two Plaintiffs (Shaffer, Shour) have RARs still pending with the Marines. Compl ¶¶ 50-51. Even if the other Services take action with respect to any of these Navy plaintiffs assigned to other Services, *see* Ex. 8 ¶ 16; Ex. 6 ¶ 32, they cannot be separated from the Navy in light of the Texas injunction, *see* Ex. 4 ¶ 23.

**Other Litigation**. Numerous other challenges to the military's vaccination requirement have been brought across the country. At least sixteen other courts have rejected similar arguments for preliminary injunctive relief against the military or dismissed the service members' claims entirely. *See Abbott v. Biden*, 2022 WL 2287547 (E.D. Tex. June 24, 2022); *Miller v. Austin*, 4:22-cv-01739 (S.D. Tex. June 1, 2022); *Knick v. Austin*, 2022 WL 2157066 (D.D.C. June 15, 2022); *Roth v. Austin*, 2022 WL 1568830 (D. Neb. May 18, 2022); *Creaghan v. Austin*, 2022 WL 1500544 (D.D.C. May 12, 2022); *Navy SEAL 1 v. Austin*, --- F. Supp. 3d ---, 2022 WL 1294486 (D.D.C. Apr.

29, 2022); *Thomas Short v. Berger*, 2022 WL 1203876 (D. Ariz. Apr. 22, 2022); *Vance v. Wormuth*, 2022 WL 1094665 (W.D. Ky. Apr. 12, 2022); *Roberts v. Roth*, 2022 WL 834148 (D.D.C. Mar. 21, 2022); *Mark Short v. Berger*, 2022 WL 1051852 (C.D. Cal. Mar. 3, 2022); Ex. 19, *Dunn v. Austin*, No. 22-cv-00288 (E.D. Cal. Feb. 22, 2022) ("Dunn Op."); *Robert v. Austin*, 2022 WL 103374 (D. Colo. Jan. 11, 2022); *Oklahoma v. Biden*, --- F. Supp. 3d ---, 2021 WL 6126230 (W.D. Okla. Dec. 28, 2021); *Guettlein v. U.S. Merch. Marine Acad.*, --- F. Supp. 3d ---, 2021 WL 6015192 (E.D.N.Y. Dec. 20, 2021); *Doe #1-#14 v. Austin*, --- F. Supp. 3d ---, 2021 WL 5816632 (N.D. Fla. Nov. 12, 2021); *Church v. Biden*, --- F. Supp. 3d ---, 2021 WL 5179215 (D.D.C. Nov. 8, 2021). Moreover, in *Dunn*, where the district court denied the service member's preliminary injunction motion, the Supreme Court denied the member's application for an injunction pending appeal. *Dunn v. Austin*, 142 S. Ct. 1707 (2022) (mem.).

Five courts have preliminary enjoined DoD and the respective Service from applying COVID-19 vaccination requirements or taking adverse action against plaintiffs in those cases. *See Navy SEALs 1–26 v. Biden*, --- F. Supp. 3d ---, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022); *Navy SEAL 1 v. Biden*, 2022 WL 483832 (M.D. Fla. Feb. 2, 2022); *Air Force Officer v. Austin*, --- F. Supp. 3d ---, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022); *Poffenbarger v. Kendall*, --- F. Supp. 3d ---, 2022 WL 594810 (S.D. Ohio Feb. 28, 2022); *Doster v. Kendall*, --- F. Supp. 3d ---, 2022 WL 982299 (S.D. Ohio Mar. 31, 2022). The government strongly disagrees with those decisions, and in *Navy SEALs 1-26*, the Supreme Court granted the government's application for a partial stay of the district court's injunction. *Austin v. Navy SEALs 1–26*, 142 S. Ct. 1301 (2022) (mem.).[2] Simi-

---

[2] The district court in *Navy SEALs 1-26* subsequently entered a class-wide preliminary injunction against the Navy, also partially stayed, which the Government has also appealed. 2022 WL

larly, in *Navy SEAL 1*, the Eleventh Circuit stayed the district court's injunction pending appeal "insofar as it precludes the Navy from considering the plaintiffs' vaccination status in making deployment, assignment, and other operational decisions." No. 22-10645 (11th Cir. Mar. 30, 2022).

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," Plaintiffs must "clearly establish[]" four elements: (1) substantial likelihood of success on the merits; (2) substantial threat of irreparable injury absent an injunction; (3) that the threatened injury outweighs the damage an injunction would cause to Defendants; and (4) that the injunction would serve the public interest. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001). "Failure to show any of the four factors is fatal . . . ." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

Additionally, courts extend great deference to the military when called to review the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force," which are "essentially professional military judgments." *Winter*, 555 U.S. at 24 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)); *Farmer v. Mabus*, 940 F.2d 921, 923 (5th Cir. 1991) ("We are keenly aware that judicial intrusion into military matters is to be most cautiously and charily approached."). As the Supreme Court has repeatedly emphasized, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at

---

1025144, at *9, *appeal filed* No. 22-10534 (5th Cir. May 27, 2022). The district court in *Navy SEAL 1* also subsequently entered injunctive relief on behalf of an additional individual, who was later severed to a separate action, and Defendants appealed. *See Col. Fin. Mgmt. Officer v. Austin,* 8:22-cv-01275-SDM-TGW, ECF Nos. 173, 194 (M.D. Fla.).

10; *see also Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ("[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise[, and] [t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress [] and with the President."); *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (noting that because of the "healthy deference to legislative and executive judgments in the area of military affairs," courts employ a relaxed scrutiny in reviewing military policy); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986); *Navy SEALs 1-26*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring).

## ARGUMENT

### I.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

The Court lacks jurisdiction over this case for several reasons, foreclosing any finding of substantial likelihood of success on the merits. *See Digit. Props., Inc. v. City of Plantation*, 121 F.3d 586, 591 n.5 (11th Cir. 1997). Additionally, even if Plaintiffs could establish jurisdiction, they cannot show they are likely to succeed on the merits of any of their claims, which rest on factual and legal misconceptions.

### A. Plaintiffs Lack Venue in this District and Division.

As an initial matter, Plaintiffs fail to establish likely success on the merits because they have brought their action in the wrong court. 28 U.S.C. § 1391(e) requires that actions against officers of the United States be brought in the district in which (1) "a defendant in the action resides," (2) "a substantial part of the events or omissions giving rise to the claim occurred," or (3) "the plaintiff resides." M.D. Fla. R. 1.04(b) sets forth further requirements for determining the appropriate division in which to bring an action: "[a] party must begin an action in the division to which the action is most directly connected or in which the action is most conveniently advanced." Here, however, no defendant resides within the Middle District of Florida—much less the

Tampa division—as all defendants perform their official duties in Washington, D.C. *See, e.g.*, 14D Arthur R. Miller, et al., Federal Practice and Procedure § 3815 (4th ed. 2013) ("the relevant inquiry is the official residence"); *Smith v. Dalton*, 927 F. Supp. 1, 6 (D.D.C. 1996); *Rogers v. Civil Air Patrol*, 129 F. Supp. 2d 1334, 1338 (M.D. Ala. 2001). No part of the events giving rise to Plaintiffs' claims occurred within this district and division either, as the vaccination requirement they challenge issued out of Washington, D.C., and no Plaintiff is stationed within this district or division such that any events here could give rise to their claims. *See* Compl. ¶¶ 28-58.

Moreover, out of 31 Plaintiffs, 29 readily admit that they reside out of this division, out of this district, and out of this state. *Id.* ¶¶ 28-31, 33-38, 40-58. A mere *two* claim domicile in the Middle District, but neither has any connection to the Tampa division—and Plaintiffs make no effort to demonstrate such connection. *Id.* ¶ 32, 39 (alleging domicile in the Fort Myers and Jacksonville divisions). Instead, they argue that the action "is most conveniently advanced" here because "[t]here is already a similar case in the Tampa Division." Compl. ¶ 71 (citing *Navy SEAL 1*, No. 8:21-cv-2429). But the mere existence of another case cannot overcome the admitted lack of connection between Plaintiffs and this division and district. *See Rahall v. Awada*, 8:20-cv-2372, 2020 WL 10460631, at *2 (M.D. Fla. Oct. 14, 2020) (requiring "a sufficient nexus between the events giving rise to th[e] action and the Middle District, Tampa Division"). Moreover, this action raises issues that did not appear in *Navy Seal 1*, including claims concerning the NDAA; the Establishment, Free Speech, and Right to Petition Clauses of the First Amendment; the Due Process Clause of the Fifth Amendment; the Administrative Procedure Act; and "Separation of Powers" generally. Plaintiffs themselves say that "[w]hile some of [their] claims are similar to those raised in other proceedings, the central claims in this proceeding are unique constitutional and

statutory claims that only Chaplains have standing to raise." Mot. for Prel. Inj. ("Mot.") 1, ECF No. 31; *see also* Compl. ¶ 4 (touting the "unique" circumstances of chaplains not present in *Navy SEAL 1*). Accordingly, all of the claims in this case should be dismissed for lack of venue.

### B. Plaintiffs' Claims Are Not Ripe and They Failed to Exhaust Administrative Remedies.

Plaintiffs filed suit before the vast majority (22 out of 31) received final decisions on their religious exemption requests and appeals, and before *any* separation (or IRR reassignment) occurred. *See supra* pp.7-8. Because their claims are not ripe and they have not exhausted their administrative remedies, the Court lacks jurisdiction to hear their claims. *Von Hoffburg v. Alexander*, 615 F.2d 633, 641 n.15 (5th Cir. 1980).

Plaintiffs with pending exemption requests and appeals do not have ripe claims because any harm from receiving the vaccine or facing adverse action rests "upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). If the military grants the requests, the service members will be exempted from COVID-19 vaccination, and while they wait for a determination, they are not subject to any adverse employment or disciplinary action. "Until Plaintiff[s] ha[ve] received a decision from the military, judicial review of [their] claim[s], even if available, has not arisen." *Frame v. United States*, No. 4:09-CV-458-RH/WCS, 2010 WL 883804, at *3 (N.D. Fla. Mar. 5, 2010; *see also Dig. Props., Inc.*, 121 F.3d at 590 (because the plaintiff filed suit before "a binding conclusive administrative decision" was issued, "no tangible controversy exists and, thus, [the court] ha[s] no authority to act"). And because a final decision has not yet been reached on most Plaintiffs' requests for religious exemption, the military has not yet

articulated with finality its views as to the least restrictive means of furthering its compelling government interest in each particular case.

Even if their exemption requests and appeals are ultimately denied, that denial, standing alone, does not cause injury. If Plaintiffs still do not get vaccinated and face adverse action, the military has additional procedures that offer many opportunities for further relief, and the consequences are uncertain. Until those military procedures are exhausted, Plaintiffs cannot seek relief in this Court. *Winck v. England*, 327 F.3d 1296, 1302 (11th Cir. 2003) ("[O]ur respect for coordinate judicial systems and their autonomy, has led us, time and again, to require exhaustion in military cases."); *Von Hoffburg*, 615 F.2d at 637 ("[T]his court has consistently held that a plaintiff challenging an administrative military discharge will find the doors of the federal courthouse closed pending exhaustion of available administrative remedies."); *Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir. 1974); *Leicht v. McHugh*, 2013 WL 11971266, at *2 (S.D. Fla. May 24, 2013); *Doe v. Ball*, 725 F. Supp. 1210, 1211 (M.D. Fla. 1989), *aff'd*, 903 F.2d 1455 (11th Cir. 1990); *Roberts*, 2022 WL 834148, at *4-6.

The nature of Plaintiffs' claims does not excuse their failure to exhaust. Even when a plaintiff "allege[s] the deprivation of a constitutional right" or "alleg[es] that the military has acted in violation of applicable statutes," he still must "exhaust[] available intraservice corrective measures" before bringing suit in federal district court. *Mindes v. Seaman*, 453 F.2d 197, 201 (5th Cir. 1971). The exhaustion requirement is especially important in the military context because it serves the important purpose of allowing the military to apply its "specialized expertise" in the first instance. *Lawrence v. McCarthy*, 344 F.3d 467, 470 (5th Cir. 2003). If Plaintiffs are dissatisfied with the

military's decision, they may seek judicial review only after exhausting military appeals, allowing the military to make its decision and fully articulate its interests. *See Winck*, 327 F.3d at 1302–04.

As other courts have recently found in similar contexts, judicial review of service members' claims without first allowing the military's internal processes to conclude "would undermine the purpose of exhaustion and infringe on the military's expertise and interest in handling its own personnel matters." *Church*, 2021 WL 5179215, at *11 (citing cases). In *Mark Short*, the court concluded that a Marine Corps officer whose appeal had been denied failed to exhaust administrative remedies because "he still must undergo separation proceedings before any permanent adverse consequences are imposed." 2022 WL 1051852, at *4. Moreover, the officer would have the opportunity to submit a "written rebuttal" during separation proceedings, and four different individuals would consider his separation, "any one of which could decide to close the process upon review of Plaintiff's written submissions." *Id.* (citing *Diraffael v. Cal. Mil. Dep't*, 2011 WL 13274364, at *3 (C.D. Cal. Mar. 21, 2011)). The court rejected the argument that the administrative remedies would be futile, finding that there is "no evidence, other than argumentative conjecture, that separation proceedings are always decided against the appealing servicemember." *Id.* at *5–6. The court also rejected the argument that exhaustion was not required because the member would suffer irreparable harm, finding that separation was not a foregone conclusion and that even if he were separated, that harm could be redressed with back pay and reinstatement into the military. *Id.* at *3–6. The same is true here. *See Leicht*, 2013 WL

11971266, at *3 (no irreparable harm in requiring the service member to pursue reme-
dies at the Board for Correction of Military Records before filing suit).[3]

### C. Any Claims that Require Review of the Military's Assignment and Oper-ational Decisions Are Non-Justiciable.

Plaintiffs ask the Court to issue an order that would, among other things, enjoin
the Services "from taking any action that would damage the career or promotion op-
portunities for plaintiffs, . . . . including denial of promotion, schooling, training, or
assignment," and require the services to "allow[] plaintiffs to move when necessary for
training, schooling, necessary denominational training or assignments." Pls.' Ex. 4,
ECF No. 31-4 at 2; *see* Mot. 4. Any claims challenging military assignment, training,
schooling, promotion, and other operational decisions plainly encroach on core Arti-
cle II prerogatives and are non-justiciable.

"[J]udges are not given the task of running the [military]," and it is the Execu-
tive officials charged with protecting national security—not courts—who have author-
ity to make duty, training, assignment, promotion, and other similar operational
decisions. *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953); *see also Dep't of Navy v. Egan*, 484
U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the
authority of the Executive in military and national security affairs."); *Gilligan*, 413 U.S.
at 10 ("The complex, subtle, and professional decisions as to the composition, training,
equipping, and control of a military force are essentially professional military judg-
ments."). Consistent with this precedent, courts have repeatedly held that decisions as
to who is placed in command of our troops or assigned to a particular billet or to be
promoted are non-justiciable. *See, e.g.*, *Orloff*, 345 U.S. at 93–94; *Speigner v. Alexander*,

---

[3] Plaintiffs additionally argue that they satisfy the *Mindes* factors. *See* Mot. 18–21. Although
the Eleventh Circuit continues to require exhaustion, it is questionable whether the *Mindes* test is oth-
erwise still good law. *See Speigner*, 248 F.3d at 1295 n.5.

248 F.3d 1292, 1298 (11th Cir. 2001); *see also Harkness v. Sec'y of the Navy,* 858 F.3d 437, 443–45 (6th Cir. 2017) (collecting cases); *Antonellis v. United States*, 723 F.3d 1328, 1336 (Fed. Cir. 2013); *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring); *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990); *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989). Plaintiffs' claims—to the extent they challenge such decisions—and their requested relief through this motion contravene not only this long-settled precedent, but also the Supreme Court's and Eleventh Circuit's latest decisions on the matter. *See Navy SEALs 1-26*, 142 S. Ct. at 1301; *id.* at 1302 (Kavanaugh, J., concurring); *Navy SEAL 1*, No. 22-10645 (11th Cir. Mar. 30, 2022).

### D. Plaintiffs Lack Constitutional Standing to Enforce the NDAA.

Plaintiffs lack standing to bring the NDAA claim under § 533(c). To obtain prospective injunctive relief, a movant must show that he "is immediately in danger of sustaining some direct injury" that is "real and immediate," not "conjectural" or "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). The movant must also show a "causal connection between the injury and the conduct complained of" and that "the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Flat Creek Transp., LLC v. Fed. Motor Carrier Safety Admin.*, 923 F.3d 1295, 1300 (11th Cir. 2019). Plaintiffs generally allege that their refusal to comply with the vaccination requirement may have certain consequences like separation. *See* Mot. 21–22; Pls.' Ex. 7, ECF No. 31-7. Even assuming these injuries are real and immediate, *but see supra* Part I.A (explaining that separation is not imminent), they are not fairly traceable to the supposed failure of the services to issue regulations under § 533 of the NDAA or to conduct religious liberty training, *see* Mot. 2, 5–7. And the alleged injuries are not redressable on these claims, either. Assuming a plaintiff with standing could demonstrate that the military was failing to meet obligations to

17

issue regulations or to conduct training, then the proper remedy would presumably be to order issuance of regulations or to order religious liberty training. It would not, however, excuse the Plaintiffs in this case from the requirement to receive a COVID-19 vaccine.[4]

### E.  Plaintiffs' NDAA Claims Are Unlikely to Succeed.

Plaintiffs purport to raise two claims under § 533 of the 2013 NDAA: first, that chaplains are being required "to perform [a] rite, ritual, or ceremony that is contrary to the conscience, moral principles, or religious beliefs of the chaplain" in violation of § 533(b), and are subject to adverse action based on their refusal to perform such a religious rite; and second, that the Secretary of Defense failed to issue regulations or implement guidance or training under this section. *See* Mot. 26–32. Neither the language of Section 533 or its legislative history support Plaintiffs' novel interpretation.

### 1.  Section 533 Does Not Create a Private Right of Action.

Plaintiffs purport to bring this claim as a cause of action created by § 533, but neither the 2013 NDAA nor subsequent NDAAs create a private right of action as to either subsection. Although these sections impose some duties on the Department of Defense, not every duty is accompanied by a cause of action. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and "[t]here must be clear evidence of Congress's intent to create a cause of action," *Love v. Delta Air Lines*, 310 F.3d 1347, 1353 (11th Cir. 2002); *see also In re Wild*, 994 F.3d 1244, 1256 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1188 (2022).

---

[4] Plaintiffs briefly assert third-party standing on behalf of "service members who were deprived of [Plaintiffs'] ministry." Mot. 23. A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). "This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party." *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990). And, as a factual matter, Plaintiffs have not demonstrated that any service member has been or will be deprived of chaplain services as a result of any administrative action against Plaintiffs.

Where the necessary intent is absent, "a cause of action does not exist and courts may not create one." *Sandoval*, 532 U.S. at 286-87.

The statutory text is devoid of any text or context that would suggest Congress intended to create a cause of action. Plaintiffs argue that § 533 is a "dead letter" if it is not judicially enforceable, Mot. 13, but that is merely a policy argument that Congress *should have* created a mechanism for judicial review. The argument is incorrect because Congress has other means to ensure compliance with its commands, and need not rely solely on the courts. The argument is also irrelevant. "Without [statutory intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286–87.[5]

## 2.  The Vaccine Mandate Does Not Violate Section 533(b).

Plaintiffs cannot establish likely success on their claim that COVID vaccination is "a rite, ritual and/or a ceremony of a government-established religion, or non-religion," in violation of § 533. Mot. 28-30. Section 533(b) provides that:

> No member of the Armed Forces may (1) require a chaplain to perform any rite, ritual, or ceremony that is contrary to the . . . religious beliefs of the chaplain; or (2) discriminate or take any adverse personnel action against a chaplain . . . , on the basis of the refusal by the chaplain to comply with a requirement prohibited by paragraph (1).

There is no reason to believe that Congress intended to prohibit vaccination requirements by this language, or that Congress would consider vaccination a "rite, ritual or ceremony" merely because some people have a religious objection to a particular vaccine. Both the plain language and legislative history confirm that Plaintiffs are wrong.

Merriam-Webster defines "rite" as "the ceremonial practices of a church or

---

[5] To the extent the Plaintiffs attempt to identify some other cause of action through which these provisions could be enforced, they need at a minimum to amend their Complaint so that Defendants and the Court can evaluate the claim.

group of churches;" "ritual" as "the established form for a ceremony;" and ceremony as "a formal act or series of acts prescribed by ritual, protocol, or convention," such as a "marriage ceremony." Merriam-Webster, https://www.merriam-webster.com/dictionary. Vaccination is not "ceremonial" or "ritual" in nature; it is a secular military readiness requirement and has been throughout American history. *See supra* Bkgrd.

A comparison of subsections (a) and (b) confirms this interpretation. Section 533(a) requires the military to "accommodate individual expressions of the belief" of a member of the armed forces and prohibits certain personnel actions on the basis of such expression, but the requirement does not apply if "it could have an adverse impact on military readiness, unit cohesion, and good order and discipline." 2013 NDAA § 533, as amended by 2014 NDAA § 532. This exception is intended to protect military readiness, which Congress recognized could be adversely affected by "individual expressions of belief." No such exception appears in subsection (b); logically, that is because there is no likely military readiness effect of a chaplain's refusal to perform a religious rite like a marriage ceremony. Plaintiffs, however, would expand subsection (b) to permit chaplains to refuse any orders with which they disagree, without regard to military importance or mission accomplishment. Congress did not intend such an extraordinary result.[6]

The legislative history also confirms this interpretation. According to the House Report, Section 533 was a compromise provision; the original House bill contained additional language that would "require the armed forces to accommodate the moral

---

[6] Plaintiffs do not appear to raise a claim under subsection (a). If they intended to raise such a claim by quoting the statutory language, Plaintiffs have not shown a likelihood of success. Like subsection (b), this language does not contain a private right of action. And substantively, it is much less protective than RFRA because it does not apply where the accommodation "could have an adverse impact on military readiness." Defendants have shown an adverse impact. *See infra* Part I.F.

principles and religious beliefs of service members concerning appropriate and inappropriate expression of human sexuality and would prohibit use of such . . . beliefs as the basis of any adverse personnel action." *See* H.R. Conf. Rep. 112-705, 739-40 (2012), 2012 U.S.C.C.A.N. 797, 850–51. The Senate version contained no language along these lines, and Section 533 was the resulting compromise language. *Id*. The original House bill also contained additional language prohibiting same-sex weddings at military installations, also removed from the final version. *See id*. at 761. In other words, Section 533(b) language was likely intended to address same-sex marriage and similar controversies, by ensuring that chaplains would not be required to perform marriage ceremonies—i.e., religious rituals—that violated their consciences. Legislative history thus underscores the intent to address ritual or ceremonial religious acts, not ordinary secular fitness requirements.[7]

### 3.  DoD Has Not Violated Section 533(c).

Plaintiffs argue that DoD violated § 533(c) "by Failing to Issue Regulations, Implement Guidance and Training, or Establish 533 Enforcement Procedures." Mot. 31-32. Plaintiffs are not likely to succeed on this claim because the statute does not impose an enforceable duty as claimed, DoD has complied with the statute, and the claim is unrelated to the injunction sought here.

When reviewing a claim alleging that an agency failed to act, courts can only compel "discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Courts typically review withheld or delayed agency action only if a federal agency has a "ministerial or non-discretionary" duty amounting to "a

---

[7] Plaintiffs also argue Defendants "retaliate[ed]" against them in violation of § 533(b). Mot. 30-31. Because the required actions are not religious rituals, enforcement of the mandate cannot constitute unlawful retaliation under that section. But Plaintiffs are also wrong that there is a causal link between religious beliefs and the Defendants' actions. *See infra* Part I.F.

specific, unequivocal command." *Id*. at 63-64. Plaintiffs have identified no command here. The 2013 NDAA stated that the Secretary "shall issue regulations implementing the protections afforded by this section." The 2014 NDAA clarified that "[n]ot later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall prescribe the implementing regulations required by subsection (c) of [§ 533 of the 2013 NDAA]." The statute does not mention "guidance and training" or "enforcement mechanisms." Plaintiffs draw that supposed obligation from the *subsequent* legislative history of later NDAAs. For example, Plaintiffs cite language from the Report accompanying the Senate version of the 2018 NDAA that encouraged establishment of a comprehensive training program. *See* Pls.' Ex. 3. That Report is not statutory language creating a discrete and mandatory duty. It is not statutory language at all.

In any event, DoD has in fact issued regulations (and required training programs and taken other steps) to implement § 533.[8] In January 2014, DoD updated DoDI 1300.17 ("Accommodation of Religious Practices within the Military Services") to incorporate Section 533(a)'s requirements (as amended) regarding general religious accommodation issues.[9] *See Rights of Conscience Protections for Armed Forces Service Members and Their Chaplains*, DODIG-2015-148, https://perma.cc/H6TK-6AMH (hereinafter "IG Report"), at 10. In March 2014, DoD also revised DoDI 1304.28 ("Guidance for the Appointment of Chaplains for the Military Departments") (which has been subsequently reissued). DoDI 1304.28 quotes the § 533(b) language and directs service secretaries to issue policies consistent with that section. *See* DoDI 1304.28 Ch.2-2, https://perma.cc/KW5A-L5VS. The IG Report also found that DoD was fully in

---

[8] DoD policy contains multiple processes for potential enforcement, including the accommodation or discipline processes themselves, *see* Background, *supra*, as well as the military EO process, *see* DoDI 1350.02, filing an Article 138 complaint under 10 U.S.C. § 198, or making an IG complaint.

[9] That document has been subsequently updated, including the 2020 version cited by Plaintiffs.

compliance with the provisions regarding the rights of chaplains. IG Report at 23. Indeed, even "[p]rior to publication of the updated DoD Instruction 1304.28, regulations governing the appointment of chaplains already prohibited anyone from requiring chaplains to perform any service contrary to their beliefs or religious practices." *Id*. Moreover, at the time of the IG report, dissemination and training was underway. *Id*. at 24-25. The current version of DoDI 1300.17 requires the Services to provide training on religious accommodations and related religious liberty issues. *See* DoDI 1300.17, Ch.2.3, https://perma.cc/24LU-3U2L; *see, e.g.*, AFI 52-201 § 3.7, https://perma.cc/5B9B-Z95N; Ex. 20 (AF training description). And, of course, there is ample guidance about accommodations for the COVID-19 vaccination requirement. Plaintiffs' bare allegation to the contrary is not evidence.

### F.  Plaintiffs' RFRA Claims Are Unlikely to Succeed.

Under RFRA, the government "shall not substantially burden a person's exercise of religion" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). Even assuming *arguendo* that the Services' vaccination requirements substantially burden Plaintiffs' sincere religious beliefs, requiring their vaccination furthers the compelling interests in military readiness and health and safety of service members, and is the least restrictive means of advancing those interests.

### i.  Vaccinating Plaintiffs Furthers the Government's Compelling Interests in Force Health and Readiness.

"Stemming the spread of COVID-19 is unquestionably a compelling interest," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020), and "no court has ever held that the military does not have a compelling interest in the health of its

23

troops" or "that vaccination against harmful diseases does not serve a compelling government interest," *Navy SEAL 1*, 2022 WL 1294486, at *9; *see also Creaghan*, 2022 WL 1500544, at *9 ("[T]here can be no greater military interest than in keeping each servicemember fit and healthy enough to accomplish their duties."); *Roth*, 2022 WL 1568830, at *17. These interests are especially compelling in the military context because "[w]hen evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Mark Short*, 2022 WL 1051852, at *7 (quoting *Goldman*, 475 U.S. at 507). The military's determinations regarding vaccinations "require a higher degree of deference because they 'improve the readiness of the force,' ... and the military relies on complex scientific data to promulgate immunization and medical requirements." *Navy SEAL 1*, 2022 WL 1294486, at *8; *see also Orloff*, 345 U.S. at 94 ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate [military] matters as the [military] must be scrupulous not to intervene in judicial matters."); *Bryant*, 532 F.3d at 899 (Kavanaugh, J., concurring) ("[I]nterfere[nce] with the military's pursuit of its critical mission and involve[ment of] the courts in military decisions . . . are well beyond the competence of judges."). The Supreme Court has repeatedly emphasized that the government's interest in "maximum efficiency" of military operations is paramount, *United States v. O'Brien*, 391 U.S. 367, 381 (1968), and "[f]ew interests can be more compelling than a nation's need to ensure its own security," *Wayte v. United States*, 470 U.S. 598, 611 (1985). And Congress expressly recognized these long-standing principles of military deference in enacting RFRA. *See* S. Rep. No. 103-111, at 12 (1993) ("The courts have always recognized the compelling

nature of the military's interest in [good order, discipline, and security] in the regulations of our armed services [and] have always extended to military authorities significant deference in effectuating these interests. The committee intends and expects that such deference will continue under this bill."); H.R. Rep. No. 103-88, at 8 (1993).

DoD has long required nine vaccines to protect service member health and readiness, and after consulting with "medical experts and military leadership," the Secretary of Defense determined that mandatory vaccination against COVID-19 was likewise necessary. *See* Sec'y of Def. Mem. (Aug. 24, 2021); Ex. 3 & FRAGO 5; Ex. 5 (ALNAV 062/21); Sec'y of Air Force Mem. at 1 (Sept. 3, 2021). The Court owes "great deference" to the "professional military judgments" of these leaders when it comes to ensuring military readiness and the welfare of service members. *Winter*, 555 U.S. at 24–25; *Comm. for GI Rights v. Callaway*, 518 F.2d 466, 480 (D.C. Cir. 1975) (emphasizing "the inherent differences between military life and civilian life and the vital interest of the nation in maintaining the readiness and fitness of its Armed Forces"); *Navy SEAL 1*, 2022 WL 1294486, at *8, 10; *Creaghan*, 2022 WL 1500544, at *8. And when "a governmental agency textually committed to resolving . . . scientific debates brought its considerable scientific, economic, and technological resources to bear in determining that vaccination . . . is necessary to accomplish military goals generally and as applied to Plaintiff," it is not Plaintiffs' or the Court's role to second-guess those judgments. *Navy SEAL 1*, 2022 WL 1294486, at *6–12; *see also Creaghan*, 2022 WL 1500544, at *8; *Mark Short*, 2022 WL 1051852, at *5.

These professional military judgments are amply supported by evidence showing the harmful impact of infectious diseases on the military and military readiness. *See* Ex. 1 ¶¶ 3-8 (detailing the numerous exercises, deployments, operations, readiness

events, and other global force management activities affected, suspended, and cancelled, and the infections, hospitalizations, and deaths of service members from COVID-19). These harms have real effects on mission efficiency. *See* Ex. 4 ¶¶ 25-27 (detailing impacts on Navy); Ex 18, Farrell Decl. ¶¶ 3–10 (explaining how vaccines generally are "crucial to keeping diseases at bay" and lack of vaccination risks "resurgence of such diseases and their associated morbidity and mortality increases").

The Services' professional military judgments are also supported by the positive effects that vaccination has on military readiness and service member health. Vaccinations have unquestionably reduced the risk of COVID-19 infections, hospitalizations, and deaths of service members. *See, e.g.*, Ex. 1 ¶¶ 16–18; Ex. 2 ¶¶ 8, 11–12; Ex. 4 ¶¶ 31-32; Ex. 18 ¶ 9; *see also Navy SEAL 1*, 2022 WL 1294486, at *10 ("[T]he overwhelming weight of scientific authority supports the proposition that COVID-19 vaccination reduces the severity and duration of disease."); *Church*, 2021 WL 5179215, at *18; *Mark Short*, 2022 WL 1051852, at *7. The overwhelming percentage of the service members who have died from COVID-19 were unvaccinated, Ex. 1 ¶ 3; Ex. 2 ¶ 12, and unvaccinated individuals have a far higher risk of being hospitalized than those who are fully vaccinated, Ex. 1 ¶ 18; Ex. 18 ¶ 9. Vaccinations also have reduced the number of service members required to quarantine, permitted the military to return to higher levels of occupancy in DoD facilities and hold in-person training, and allowed service members to participate in joint training exercises with countries that have vaccination requirements. Ex. 1 ¶ 14. And vaccinations provide necessary protection to service members in deployed environments, where access to healthcare may be limited. Ex. 18 ¶¶ 4, 6; Ex. 4 ¶¶ 27, 36. In short, vaccines provide service members with demonstrated protection against infection, serious illness, hospitalization, and death, thus "improv[ing] readiness and preserv[ing] the DoD's ability to accomplish its mission."

Ex. 1 ¶ 21.

Plaintiffs argue that the military has discriminated against service members seeking religious accommodations because the military has recognized some medical and administrative exemptions to the COVID-19 vaccine. Mot. 34. But medical exemptions serve the interest in military readiness: giving a vaccine to a service member with medical contraindications to the vaccine would harm the member's health, *detracting* from the military's interests in ensuring readiness and the health and safety of members. *See* Ex. 11 ¶¶ 15, 19; *see also Knick*, 2022 WL 2157066, at *5; *Navy SEAL 1*, 2022 WL 1294486, at *12; *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1178 (9th Cir. 2021), *cert. and application for injunction denied*, 142 S. Ct. 1099 (2022); *Does 1–6 v. Mills*, 16 F.4th 20, 31 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022). Likewise, administrative exemptions for members who are leaving the military are appropriate because requiring vaccination of individuals who will no longer be part of the force does not further the military's interest in ensuring readiness. Ex. 13 ¶ 3; Ex. 14 ¶ 5.[10]

Plaintiffs also fail to acknowledge that medical and administrative exemptions are generally time-limited—in contrast to the presumptive permanency of a sincerely held religious belief. Ex. 11 ¶¶ 8, 13; Ex. 13 ¶¶ 3–4; Ex. 14 ¶ 5; *see also Mark Short*, 2022 WL 1051852, at *5 ("Only *permanent* medical exemptions are analogous to religious exemptions, because a religious belief is not likely to be temporary."). Medical exemptions still require the service member to be vaccinated when their condition is resolved. Ex. 11 ¶¶ 14, 20. The number of medical exemptions, moreover, has been steadily declining. *Id.* ¶ 8. And the inability of some to receive the vaccines for a period of time

---

[10] These administrative exemptions also effectuate the express intent of Congress. *See* Joint Explanatory Statement to Accompany the National Defense Authorization Act for Fiscal Year 2022, p. 151, https://perma.cc/T4BG-TVDN ("We also expect the Department to include eligibility timelines for consideration of exemptions for servicemembers nearing separation and retirement in the development of uniform procedures relating to administrative exemptions.").

due to contraindications or health issues *increases* the military's compelling interest in maximizing the vaccination of other service members who do not face such health risks to prevent the spread of the disease. Ex. 18 ¶ 7. Thus, the military's recognition of exemptions where the health of the member would be compromised by vaccination, or where the member will no longer remain in the force, does not diminish its assessment that vaccination of Plaintiffs—who do not have such risks and who remain in the force—is necessary to achieve its interest in force readiness and health. Moreover, any service member who is not vaccinated is subject to the multiple deployment, assignment, and duty restrictions and limitations that Plaintiffs seek to avoid. *See* Ex. 11 ¶ 16; Ex. 6 ¶ 12; *see also Roth*, 2022 WL 1568830, at *20.[11]

### ii. Vaccination is the Least Restrictive Means of Furthering the Government's Compelling Interests.

As numerous courts have now held in the military setting, a uniform practice of vaccination is the least restrictive means for accomplishing the government's compelling interest in force health and readiness—particularly where the acceptable level of risk to the mission must be a military, not judicial, judgment. *See Navy SEALs 1–26*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring) (cautioning that a court may not "insert[] itself into the [military's] chain of command, overriding military commanders' professional military judgments"); *Mark Short*, 2022 WL 1051852, at *7; Ex. 19, *Dunn* Op. at 37–42; *Navy SEAL 1*, 2022 WL 1294486, at *10–12 (similar); *Creaghan*, 2022 WL 1500544, at *10; *Knick*, 2022 WL 2157066, at *4-5; *Roth*, 2022 WL 1568830, at *13-28; *Thomas Short*, 2022 WL 1203876, at *9-16.[12]

---

[11] DoD regulations require any service member who is non-deployable for more than 12 consecutive months to be evaluated for a retention determination. DoDI 1332.45 ¶ 1.2(b)(1), https://perma.cc/9FNU-ZR89.

[12] *Cf. Does 1–6*, 16 F.4th 20 (health-care workers); *Doe*, 19 F.4th 1173 (students); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) (health-care workers), *application for injunction denied*, 142 S. Ct. 552 (2021).

For those 9 Plaintiffs who have had their RARs denied and those denials have been adjudicated and upheld on appeal, at least two senior military officers gave careful consideration to Plaintiffs' requests and concluded that no less restrictive means than vaccination would equally serve the military's compelling interests in vaccinating these particular service members. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014) (examining whether alternative served stated interest "equally well"); *see also* Exs. 21-22 (Barfield); Exs. 25-26 (Brobst); Exs. 29-30 (Jackson); Exs. 21, 23 (Fussell); Ex. 33 (Gentilhomme); Exs. 27-28 (Henderson); Ex. 21, 24 (Layfield); Ex. 34 (Alvarado); Exs. 31-32 (Brown). For example, Plaintiff Brobst's appeal was denied after the Air Force Surgeon General reviewed the available record and explained that his "present duty assignment requires intermittent to frequent contact with others and is not achievable via telework or with adequate distancing" and concluded that foregoing immunization would have "a real adverse impact on military readiness", especially when aggregated with others. Ex. 25 ¶ 9 & Ex. 26, at 41; *accord* Ex. 29 ¶ 14; Ex. 21 ¶ 3-4; Ex. 33, at pdf p.4. And as long as Plaintiff Brobst remains unvaccinated, he will not be deployed. *See* Ex. 25 ¶ 18. Chaplain deployability is critical to the military, and the retention of unvaccinated chaplains has a substantial negative impact in the aggregate on the military operations, especially where there are multiple unvaccinated chaplains in the same unit. *See* Ex. 21 ¶¶ 4–9; Ex. 29 ¶¶ 5-6; Ex. 35 ¶ 4; *see also Katcoff v. Marsh*, 755 F.2d 223, 234 (2d Cir. 1985) (explaining the necessity of deployed chaplains).[13]

---

[13] Plaintiffs allege throughout that the military has retaliated against them because they submitted RARs. *See, e.g.*, Mot. 24. These assertions are incorrect; any adverse consequences are attributable to Plaintiffs' vaccination status (or an unrelated reason), not Plaintiffs' submission of RARs. *See, e.g.*, Ex. 3 ¶ 17 (travel policy); Ex. 29 ¶ 18 (explaining that travel and training policies applied to Jackson); *see also* Ex. 21 ¶¶ 22, 26, 34; Ex. 9 ¶ 7. All of these allegations go to their duty and training assignments, which are not justiciable.

Contrary to Plaintiffs' arguments, *see* Mot. 36 (citing Hirko Decl. (unsigned) ¶ 10, ECF No. 31-7; Jackson Decl. ¶ 12, ECF No. 31-7, at 26–27), the military has considered alternatives to vaccination. The military evaluated the feasibility and effectiveness of masking and distancing but concluded that those measures are not as effective as vaccination. Unlike vaccination, "[i]t should be obvious" that masking and distancing do not provide any protection to an infected individual from severe illness or death. *Roth*, 2022 WL 1568830, at *23; *see also* Ex. 18 ¶¶ 11–14, 24–25. Unlike vaccination, the effectiveness of masking and distancing fluctuates based on human behavior. Ex. 18 ¶¶ 11–14, 24–25; *see also* Ex. 30, at 54. And masking and distancing cannot take account of the fact that Plaintiffs frequently share workspaces and places of worship with other individuals and often come into close contact with others. Ex. 4 ¶¶ 29-30 (limited effectiveness on ships and in other environments); *see also United States v. Elder*, --- F. Supp. 3d ---, 2022 WL 836923, at *9 (E.D.N.Y. Mar. 21, 2022) ("While admirable and necessary, these protocols have their limits . . . . [They] fail to ensure the safety of large groups in close contact for sustained periods.").

Screening and testing also do not serve the military's compelling interests equally well. Screening (*i.e.*, temperature checks) can identify only if a member has a fever; it does not detect COVID-19. Ex. 18 ¶ 15. Serial testing curtails COVID-19 exposure after the infection is detected, but it "is not as effective as preventing the original infection." *Id.* ¶ 19; *Roth*, 2022 WL 1568830, at *24 ("[T]he Air Force's compelling interest is in preventing COVID-19 in the first place."). Nor do testing and temperature checks prevent a service member who tests positive from suffering serious health outcomes, such as long COVID, hospitalization, and death. Ex. 18 ¶ 20. Moreover, the "virus can be easily transmitted to others prior to symptom development and therefore may infect significant numbers before being identified." Ex. 2 ¶ 10; *see* Ex. 18 ¶¶ 18–

19.

Plaintiffs' proposal that "natural immunity" is an adequate alternative, Mot. 37, also fails. The medical evidence leaves much unknown about the strength, consistency and duration of protection offered by prior infection, and there is no scientific consensus on the amount of antibodies that would indicate protection from reinfection, or for how long or to what degree such protection would exist. Ex. 18 ¶¶ 22–23; Ex. 2 ¶¶ 20–22, 30; *see also Navy SEAL 1*, 2022 WL 1294486, at *7 (rejecting argument that "natural immunity is superior to vaccination"); Ex. 19, *Dunn* Op. at 39–40 (same); *Biden v. Missouri*, 142 S. Ct. 647, 653–54 (2022) (concluding that it was rational for an agency to rely on CDC guidance in requiring vaccination even for individuals with "natural immunity"); *Norris v. Stanley*, 2022 WL 557306, at *4 (W.D. Mich. Feb. 22, 2022) (similar); *Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1177 (D.N.M. 2021) (similar), *aff'd*, 2022 WL 2129071 (10th Cir. June 14, 2022). There is no FDA-approved test to assess protection from prior infection, and the military—in accordance with CDC guidance—does not presently recognize medical exemptions for prior infection because of the lack of medical and scientific support. Ex. 18 ¶¶ 26–27; Ex. 2 ¶¶ 20–22, 43; *see also Navy SEAL 1*, 2022 WL 1294486, at *11 n.6 (rejecting "natural immunity" as a less restrictive alternative); *Knick*, 2022 WL 2157066, at *5 (same); *Roth*, 2022 WL 1568830, at *25–26 (same); *see also* FDA, *Antibody (Serology) Testing for COVID-19: Information for Patients and Consumers* (Feb. 24, 2022), https://perma.cc/WY9T-6LSG.

Plaintiffs also suggest that they should be permitted to continue unvaccinated as before because they have performed their duties throughout the pandemic. *See* Hirko Decl. ¶ 10, ECF No. 31-7, at -3; Jackson Decl. ¶ 12, ECF No. 31-7, at 26–27. This is not an "alternative" to vaccination, as it fails to serve the military's compelling interests at all, let alone equally well. As other courts have emphasized:

> [M]erely because the military has found ways to perform its duties despite
> the risks of COVID-19 does not mean it must endure these risks indefi-
> nitely when there are effective means of mitigating them . . . . [T]he mil-
> itary is [ ] entitled to use the most effective means available to end its crisis
> footing and return to a semblance of normalcy.

*Mark Short*, 2022 WL 1051852, at *9; *see also Navy SEAL 1*, 2022 WL 1294486, at *12.

RFRA does not require the military "to continue to 'muddle through' with less effec-

tive means once superior means of furthering its compelling interest, in the form of

FDA-approved vaccines, were available." *Roth*, 2022 WL 1568830, at *28; *see, e.g.*, Ex.

32, at 4.[14]

   In sum, the military is best situated to assess whether a specific unvaccinated

individual puts the military mission at risk and whether effective, less restrictive alter-

natives are available. The Services made those considered judgments here (for the

Plaintiffs who received final decisions), which are entitled to deference.

### G. Plaintiffs' Free Exercise Claims Are Unlikely to Succeed.

   Plaintiffs' claim under the Free Exercise Clause fails as well. "[R]eview of mil-

itary regulations challenged on First Amendment grounds is far more deferential than

constitutional review of similar laws or regulations designed for civilian society." *Gold-*

*man*, 475 U.S. at 507; *id.* at 510; *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2420 n.5 (2018)

(noting, in rejecting, Establishment Clause claim, that the respondents there "cite no

authority for [their] proposition that the more free-ranging inquiry [they] propose[] is

appropriate in the national security . . . context"). This precedent "[a]t a minimum"

suggests that "when a member of the military challenges a regulation or policy of the

---

[14] Plaintiffs criticize the military for not better addressing their specific alternative proposals
(such as masking, social distancing, and natural immunity) in the letters denying the Plaintiffs' RARs.
*See* Mot. 36–37. However, the decision memorandums are meant to notify service members of the
outcome of their request, not to provide a comprehensive explanation of the individualized determi-
nations. *See Roth*, 2022 WL 1568830, at *13–15. In any event, a review of the RAR files shows con-
sideration of less restrictive alternatives in each case. *See, e.g.*, Ex. 26, at 41-48; Ex. 32, at 3-4; Ex. 33,
at pdf pp. 3-5; Ex. 34, at pdf pp. 3, 14.

military on Free Exercise grounds, courts should normally apply a level of scrutiny below that of strict scrutiny and evidently comparable to rational basis review." *Navy SEAL 1*, 2022 WL 1294486, at *13; *see also Creaghan*, 2022 WL 1500544, at *7. Plaintiffs' claim founders under *Goldman*'s highly deferential standard. "[T]he overwhelming weight of scientific authority supports the proposition that COVID-19 vaccination reduces the severity and duration of disease," and Plaintiffs' belief that vaccination is unnecessary "contravene[s] the hundreds of scientists, immunologists, virologists, and epidemiologists that support Defendants' position." *Navy SEAL 1*, 2022 WL 1294486, at *10–11; *see also supra* at 29–31.[15]

### H. Plaintiffs' Establishment Clause Claims Are Unlikely to Succeed.

The Establishment Clause of the First Amendment provides that government "shall make no law respecting an establishment of religion." "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Courts have previously looked to see whether a law facially prefers one denomination over another, and if not, applied the test announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971): examining the purpose and effect of the law, and whether it resulted in excessive entanglement with religion or religious institutions. *See, e.g.*, *In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013); *Harkness*, 858 F.3d 448-49. The Supreme Court has more

---

[15] Plaintiffs incorrectly argue that strict scrutiny applies to the Free Exercise claim. To be clear, their claims would fail even under that standard for the same reasons discussed in the RFRA analysis above. But strict scrutiny is inapplicable here because of the military context, which renders inapposite Plaintiffs' arguments that the vaccine requirement is not neutral. *See Navy SEAL 1*, 2022 WL 1294486, at *13 ("[T]he present debate over whether the mandate is both neutral and generally applicable is largely academic because *Smith's* exemption analysis is inapplicable to the military context."); *Creaghan*, 2022 WL 1500544, at *7. In any event, the vaccine requirement is neutral and generally applicable because it applies to *all* members of the respective Services, does not make any reference to religion, and was expressly implemented to ensure force readiness—not to suppress religious belief. *See, e.g.*, *Dunn* Op. at 43-44; *We The Patriots*, 17 F.4th at 281; *Doe*, 19 F.4th at 1177.

recently criticized *Lemon* and its progeny, and has now formally abrogated the *Lemon* test in favor of interpreting the Establishment Clause by "reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, No. 21-418, 2022 WL 2295034, at *14 (U.S. June 27, 2022).

Here, there is no denominational preference at issue. The vaccine requirement does not facially discriminate on the basis of religion or denomination or belief. *See* Sec'y of Def. Mem., https://perma.cc/N759-S758; *see also Navy Chaplaincy*, 738 F.3d at 430; *Harkness*, 858 F.3d at 448-49; *cf. Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 266 (1977) (in equal protection context, impact is not determinative). Like the other long-standing vaccination requirements, the COVID-19 vaccine requirement imposes a scientifically-supported and military-risk-based medical readiness requirement to ensure that the military protects its members and readiness to the greatest extent possible. *See supra* pp. 28-32. Plaintiffs cite *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), for the proposition that the government cannot "coerce" them to be vaccinated, but that case stands for the much simpler proposition that the Government cannot force schoolchildren to express a particular opinion. Plaintiffs are not being asked to express a belief or opinion. The Establishment Clause only forbids coercion of religious activity, and as explained, the military's COVID-19 vaccination requirement does not impose any inherently religious requirement, such as prayer or Bible reading.

With respect to "historical practices and understandings," *see Kennedy*, 2022 WL 2295034, at *14, vaccine requirements in the military were first imposed by George Washington, and are supported by ample historical and scientific evidence. *See supra* pp. 28-32. Defendants are not aware of any instance in which these requirements have been held to violate the Establishment Clause, or that the Establishment Clause for

some reason might afford chaplains special treatment with respect to vaccine requirements. Moreover, courts have properly deferred to the government regarding Establishment Clause claims in the national-security context. *See, e.g., Trump*, 138 S. Ct. at 2420 n.5; *Katcoff*, 755 F.2d at 234. Neither the motion nor the Complaint suggests any reason to believe that military vaccination requirements are inconsistent with historical practices and understandings of the Establishment Clause.

Plaintiffs allege, without evidence, an improper motivation. Mot. 37-42. But the RAR process is not "designed to destroy Plaintiffs' careers and faith," *id.* at 38; it is designed to accommodate sincere beliefs to the extent possible without compromising military readiness. That many (but not all) RARs are denied is not evidence of animus; it is wholly consistent with a finding that the military assesses its interests in vaccination of service members as extremely compelling and not readily satisfied by less restrictive alternatives except in unusual cases. *Roth*, 2022 WL 1568830, at *15. Plaintiffs' accusations of "bigotry" otherwise rely on their meritless NDAA claims, not on any actual evidence of hostility. Mot. 38-40. Finally, even if strict scrutiny did apply, Defendants meet the standard. *See supra* Part I.F. The additional argument Plaintiffs rely on here, that the vaccine is not 100% effective against infection, does not undermine that conclusion. Vaccination significantly reduces the risk of infection, and substantially reduces the risk of severe illness and death. *See* Ex. 1 ¶¶ 16–18; Ex. 2 ¶¶ 8, 11–12.

### I.  Plaintiffs' Religious Test Claims Are Unlikely to Succeed.

The Constitution provides that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const. art. VI. Plaintiffs do not allege that they have ever been required to submit to a religious

test—that is "to profess a belief or disbelief in any religion," at any time. *See Torcaso v. Watkins*, 367 U.S. 488, 495 (1961).[16] Plaintiffs identify no such test.

## II.   Plaintiffs Do Not Face Irreparable Harm.

Plaintiffs also fail to demonstrate irreparable injury. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). To start, because "[a] preliminary injunction requires showing 'imminent' irreparable harm," even a few months' delay in seeking that relief "militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (five-month delay "fatally undermined any showing of irreparable injury"); *see also Scroos LLC v. Att'y Gen.*, 2020 WL 5534281, at *2 (M.D. Fla. Aug. 27, 2020) (one-month delay in filing complaint and three-month delay in seeking preliminary relief "weighs heavily" against movants). Here, most of the Plaintiffs whose appeals have been adjudicated received those decisions in January, March, and April 2022. Compl. ¶¶ 28-30, 41-42. Although they allege there is an emergency requiring immediate relief, Plaintiffs inexplicably waited up to four months to bring this action, and even then, waited nearly another two months before seeking preliminary relief. Compl. (filed May 18, 2022); Mot. (filed June 29, 2022). This delay "necessarily undermines a finding of irreparable harm." *Wreal*, 840 F.3d at 1248.

Regardless, Plaintiffs' showing on this essential element fails because they do not demonstrate any actual and imminent harm that is beyond remediation. *Ne. Fla. Chapter*, 896 F.2d at 1285; *see also Shaw v. Austin*, 539 F. Supp. 3d 169, 183 (D.D.C.

---

[16] Scholars have found that the Religious Test Clause was "meant specifically to apply to any imposed oath, or its formal equivalent, that would require the oath-taker to swear to a religious belief . . . as an absolute condition of public office." Paul Horwitz, Religious Tests in the Mirror: The Constitutional Law & Constitutional Etiquette of Religion in Judicial Nominations, 15 Wm. & Mary Bill Rts. J. 75, 114-15 (2006).

2021) ("In cases involving claims related to military personnel decisions, . . . the show-ing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military af-fairs."). Plaintiffs refer tangentially to "loss of careers; veterans benefits; medical cov-erage; for some retirement eligibility; severe trouble in finding civilian employment," "duty and ministry restrictions," and other "reassignment," Mot. 19–20, 43, but these allegations do not constitute irreparable harm for two reasons that Plaintiffs them-selves acknowledge. First, there is no actual and imminent harm, as 22 out of 31 Plain-tiffs have not received decisions on their appeals and thus do not face any possibility of separation (much less any consequences from separation). Compl. ¶¶ 31-40, 43-58; *see also* Mot. 43. The Navy Plaintiffs cannot be separated in light of the injunction in the Texas case. Even the 9 others who have had their appeals denied do not face certain and immediate separation; separation proceedings take several months to a year to conclude—stripping Plaintiffs' claims of imminence—and can result in a decision to retain them in the military—defeating any contention of certain injury. *See Shaw*, 539 F. Supp. 3d at 183. Second, all of these employment-related harms (assuming, contrary to the record, that they are actual and imminent) "are definitionally reparable." *Navy SEAL 1*, 2022 WL 1294486, at *15 (citing cases); *see also* Mot. 44.

Plaintiffs' reflexive statement that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury," Mot. 43, is inapposite here. Plaintiffs fail to establish that they have suffered any injury at all where they still have administrative remedies to exhaust, let alone that their consti-tutional claims have merit—so any infringement is neither "threatened [nor] occur-ring." *Elrod v. Burns*, 427 U.S. 347, 374 (1976). Moreover, this case is not one in which "government action actually prevented an individual's religious exercise." *Navy SEAL*

*1*, 2022 WL 1294486, at \*16. In contrast to cases in which closure of places of worship literally prevented the exercise of religion in group settings, here "no government actor is preventing Plaintiff[s] from exercising [their] alleged religious conviction against COVID-19 vaccination." *Id.* Plaintiffs "may exercise [their] religion[s] by declining to receive the vaccination," just as they "remain[] free to depart the military" and to "attend[] religious services." *Id.*; *see also Knick*, 2022 WL 2157066, at \*6; *Thomas Short*, 2022 WL 1203876, at \*8.[17]

## III. The Equities and Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—tilt decisively against granting a preliminary injunction here. The public has an exceptionally strong interest in national defense, *see Winter*, 555 U.S. 7, and, for all of the reasons explained above, the military has a compelling interest in requiring its forces to be vaccinated, healthy, and ready to accomplish any and every military mission. *See also North Dakota v. United States*, 495 U.S. 423, 443 (1990). That interest outweighs Plaintiffs' claimed interest in protecting their constitutional rights—which, as shown above, Defendants are not violating—as many other courts have held. *See Knick*, 2022 WL 2157066, at \*3; *Navy SEAL 1*, 2022 WL 1294486, at \*16-17; *Creaghan*, 2022 WL 1500544, at \*11; *Roth*, 2022 WL 1568830, at \*31; *Church*, 2021 WL 5179215, at \*18-19; *Oklahoma*, 2021 WL 6126230, at \*14; *Mark Short*, 2022 WL 1051852, at \*9-10;

---

[17] Notably, the support for Plaintiffs' claims of irreparable harm comes from three select decisions granting preliminary injunctions—two of which (*Navy SEALs 1-26* (N.D. Tex.) and *Navy SEAL 1* (M.D. Fla.)) were partially stayed by the Supreme Court and Eleventh Circuit. *See Navy SEALs 1-26*, 142 S. Ct. 1301; *Navy SEAL 1*, No. 22-10645 (11th Cir. Mar. 30, 2022). Numerous other decisions that Plaintiffs neglect to mention have found no irreparable harm in the types of allegations advanced here. *See, e.g., Knick*, 2022 WL 2157066, at \*6; *Creaghan*, 2022 WL 1500544, at \*10-11; *Navy SEAL 1*, 2022 WL 1294486, at \*15-16; *Roth*, 2022 WL 1568830, at \*30; *Thomas Short*, 2022 WL 1203876, at \*6-8; *Mark Short*, 2022 WL 1051852, at \*8; *Dunn* Op. at 45-46, *injunction pending appeal denied*, 142 S. Ct. 1707 (2022).

Ex. 19, *Dunn* Op. at 46–47; *cf. Dunn*, 142 S. Ct. 1707 (declining to enter injunctive relief pending appeal of district court's denial of preliminary injunction motion).

Additionally, the military has clear discretion to handle matters of good order and discipline—including compliance with lawful orders—without interference from the judiciary. *Chappell v. Wallace*, 462 U.S. 296, 300–01 (1983); *Miller v. United States*, 42 F.3d 297, 303 (5th Cir. 1995) (concern for preserving military discipline is "the most important consideration in any single case"). The injunction Plaintiffs request would negate the military's ability to issue lawful orders to protect its forces as it sees fit (in addition to impermissibly encroaching on Article II prerogatives, as discussed above). "In evaluating the harm to the [military], the court must consider the aggregate harm of all these possible claims, 'looking at the total effect of such cases.'" *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 286 (D.D.C. 2005); *see also Bors v. Allen*, 607 F. Supp. 2d 204, 212 (D.D.C. 2009); *Guerra v. Scruggs*, 942 F.2d 270, 275 (4th Cir. 1991) (finding "substantial" harm to the Army, where upholding the injunction at issue would have a ripple effect, resulting in "a disruptive force as to affairs peculiarly within the juris-diction of the military authorities"). "[T]he possibility of substantial disruption and diversion of military resources" presented by the proliferation of such claims "in the aggregate" provides yet another reason for the Court to conclude that the public inter-est and balance of equities strongly warrants denial of preliminary relief. *Parrish v. Brownlee*, 335 F. Supp. 2d 661, 669 (E.D.N.C. 2004); *see also Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 36 (D.D.C. 2007) (declining to consider relief that would "assign the Court the role of monitoring [the Navy's chaplaincy program]").

Finally, even if the Court were to disagree with Defendants' arguments, the law is clear that any injunctive relief should be no broader than necessary to provide relief

to the plaintiffs before the Court.[18] *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see also Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring) (explaining the harm of nationwide injunctions). "Narrower injunctive relief is especially appropriate here considering the deference given to military authorities concerning the importance of a particular military interest, the significant public interest in ensuring a strong national defense, and the potential for a wide array of bases for a religious accommodation request." *Poffenbarger*, 2022 WL 594810, at *20. The programmatic relief Plaintiffs seek would regulate the military's day-to-day procedures for making personnel and assignment decisions intended to protect the health of the force. Such universal or class-wide injunctive relief would be clearly improper—especially before a class is certified.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: July 12, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director

*s/ Michael P. Clendenen*
AMY ELIZABETH POWELL
ANDREW E. CARMICHAEL
Senior Trial Counsel
MICHAEL P. CLENDENEN

---

[18] Here, Plaintiffs request relief for putative class members, ECF No. 31-4, but there is no class certified. *See Piambino v. Bailey*, 757 F.2d 1112, 1136 n.62 (11th Cir. 1985) (stating that a non-party could not seek an injunction); *Jones v. Arnold*, No. 3:09-cv-1170, 2010 WL 11507773, at *1 (M.D. Fla. May 7, 2010) ("An unnamed 'class member' in an uncertified class . . . is not a party to this case and lacks standing here to seek the relief requested in the Motion for Preliminary Injunction").

CATHERINE M. YANG
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0693
Fax: (202) 616-8460
Email: michael.p.clendenen@usdoj.gov
*Counsel for Defendants*